UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MARC DUPERVIL, as the Proposed
Administrator of the Estate of FREDERIC
DUPERVIL, Deceased,

                         Plaintiff,

           - against -

ALLIANCE HEALTH OPERATIONS, LCC,
d/b/a LINDEN CENTER FOR NURSING
AND REHABILITATION, and JOHN AND
JANE DOES 1–10,

                   Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-4042 (PKC) (PK)

PAMELA K. CHEN, United States District Judge:

      This case arises from the death of Plaintiff's father, who passed away after contracting COVID-19 while residing at a nursing home in Brooklyn, New York.  Plaintiff filed suit in state court against the nursing home and unnamed health care professionals working at the facility, asserting various state-law claims for negligence, gross negligence, wrongful death, malpractice, and violation of New York Public Health Law.  Defendants removed the matter to this Court on two alleged, independent grounds: (1) that there is federal-question jurisdiction; and (2) that Defendants are federal officers entitled to a federal forum.  Plaintiff presently moves to remand. Because this case presents no question of federal law that confers jurisdiction on the Court, and because Defendants cannot be considered federal officers, the Court grants the motion to remand.

## BACKGROUND

### I.    Case Background

      Plaintiff is the proposed administrator of his father's estate.  (Complaint, Dkt. 1-1, ¶¶ 1–2.)  Plaintiff's father, a resident of the State of New York, lived at the Linden Center for Nursing

and Rehabilitation ("Linden Center") in Brooklyn. (*Id.* ¶¶ 4–5.) While residing at Linden Center, Plaintiff's father contracted COVID-19, and died as a result on April 1, 2020. (*Id.* ¶¶ 33–34.)

Following his father's death, Plaintiff filed this suit in the Supreme Court of New York, Kings County, on May 26, 2020. The crux of Plaintiff's complaint is that the Linden Center and health care professionals working at the facility (collectively, "Defendants") failed to take precautions to prevent the spread of COVID-19, which ultimately caused the death of Plaintiff's father. (*Id.* ¶ 35.) In particular, Defendants allegedly "failed to appropriate[ly] separate residents in accordance with local, state and federal guidance"; "failed to enforce social distancing among residents"; "failed to enforce social distancing among staff"; "failed to cancel all group activities and communal dining"; "failed to timely restrict all visitors"; "failed to ensure appropriate staffing levels"; "failed to ensure all residence [*sic*] wear a cloth face covering"; "failed to ensure all health care professionals were provided  a facemask or cloth covering while in the facility"; "failed to ensure all health care professionals wore a facemask or cloth covering while in the facility"; "failed to adequately screen volunteers and non-essential healthcare personnel prior to allowing their entrance into the facility"; "failed to actively screen everyone entering the building for fever and symptoms of COVID-19"; and "failed to monitor local, state and federal health guidance on the coronavirus for maintaining the safety of its residents." (*Id.* ¶¶ 110–21; *see also id.* ¶¶ 134–45, 158–69.) The Complaint alleges various state-law claims of negligence, gross negligence, wrongful death, medical and nursing malpractice, and violation of New York Public Health Law. (*Id.* ¶¶ 57–197.)

On August 31, 2020, Defendants filed a Notice of Removal, asserting two independent grounds for removal. (*See* Notice of Removal, Dkt. 1.) First, Defendants argue that the case is removable under 28 U.S.C. § 1441(a) because it is one "arising under" federal law within the

meaning of 28 U.S.C. § 1331.  (*Id.* ¶ 9.)  Specifically, according to Defendants, although Plaintiff's claims sound in state tort law, the claims are completely preempted by, or necessarily and significantly implicate, the Public Readiness and Emergency Preparedness ("PREP") Act, 42 U.S.C. § 247d-6d.  (*Id.* ¶¶ 14–16, 20–24.)  Second, and alternatively, Defendants argue that the case is removable under 28 U.S.C. § 1442(a)(1) because Defendants are federal officers or the equivalent.  (*Id.* ¶ 12.)  Defendants assert that they qualify for federal-officer removal under § 1442(a)(1) because "the Centers for Medicare and Medicaid Services ('CMS') and the Centers for Disease Control ('CDC') specifically compelled healthcare providers and nursing homes to respond to the COVID-19 pandemic," and therefore, Defendants were "acting under specific federal instructions/regulations."  (*Id.* ¶ 13.)  Plaintiff timely moved to remand.  (*See* Motion to Remand ("Mot."), Dkt. 11.)

## II.    PREP Act

The PREP Act generally provides that

> a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration [by the Secretary of Health and Human Services] has been issued with respect to such countermeasure.

42 U.S.C. § 247d-6d(a)(1).  In March 2020, the Secretary of Health and Human Services ("the Secretary") issued a declaration under the PREP Act regarding the COVID-19 pandemic.  85 Fed. Reg. 15,198 (Mar. 17, 2020).  The Declaration has since been amended five times.  *See* First Amended Declaration, 85 Fed. Reg. 21,012 (Apr. 15, 2020); Second Amended Declaration, 85 Fed. Reg. 35,100 (June 8, 2020); Third Amended Declaration, 85 Fed. Reg. 52,136 (Aug. 24, 2020); Fourth Amended Declaration, 85 Fed. Reg. 79,190 (Dec. 9, 2020); Fifth Amended Declaration, 86 Fed. Reg. 7,872 (Feb. 2, 2021).

A "covered countermeasure" under the PREP Act is defined as "a qualified pandemic or epidemic product"; "a security countermeasure"; a "drug . . . , biological product . . . , or device . . . that is authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act [*i.e.*, FDCA]"; or "a respiratory protective device that is approved by the National Institute for Occupational Safety and Health [*i.e.*, NIOSH], . . . and that the Secretary determines to be a priority for use during a public health emergency declared under section 247d of this title." 42 U.S.C. § 247d-6d(i)(1). The statute in turn defines both a "qualified pandemic or epidemic product" and a "security countermeasure." A qualified pandemic or epidemic product is a "drug," "biological product," or "device" that is

> (i) a product manufactured, used, designed, developed, modified, licensed, or procured (I) to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or (II) to limit the harm such pandemic or epidemic might otherwise cause;

> (ii) a product manufactured, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious or life-threatening disease or condition caused by a product described in clause (i); or

> (iii) a product or technology intended to enhance the use or effect of a drug, biological product, or device described in clause (i) or (ii)[.]

*Id.* § 247d-6d(i)(7)(A). Such drug, biological product, or device must also be approved or cleared under the FDCA, licensed under the Public Health Service Act ("PHSA"), subject to an exemption, or authorized for emergency use. *Id.* § 247d-6d(i)(7)(B). A security countermeasure is a "drug," "biological product," or "device" that

> (i)(I) the Secretary determines to be a priority . . . to diagnose, mitigate, prevent, or treat harm from any biological, chemical, radiological, or nuclear agent identified as a material threat [by the Secretary of Homeland Security], or to diagnose, mitigate, prevent, or treat harm from a condition that may result in adverse health consequences or death and may be caused by administering a drug, biological product, or device against such an agent; (II) the Secretary determines . . . to be a necessary countermeasure; and (III) (aa) is approved or cleared under [the FDCA] or licensed under [the PHSA]; or (bb) is a countermeasure for which the Secretary

4

determines that sufficient and satisfactory clinical experience or research data (including data, if available, from pre-clinical and clinical trials) support a reasonable conclusion that the countermeasure will qualify for approval or licensing within 10 years after the date of a determination [that procurement of the countermeasure is appropriate]; or

(ii) is authorized for emergency use under section 564 of the [FDCA].

*Id.* § 247d-6b(c)(1)(B); *see also id.* § 247d-6d(i)(1)(B).  A "biological product" is "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings."  *Id.* § 262(i); *see also id.* §§ 247d-6b(c)(1)(B), 247d-6d(i)(7).  The term "device," which is adopted from the FDCA, means "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory" that is

(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 321(h); *see also* 42 U.S.C. §§ 247d-6b(c)(1)(B), 247d-6d(i)(7).

In accordance with the various terms of the PREP Act, the Secretary's March 2020 Declaration under the Act specifically defines a "covered countermeasure" as

any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product.

Declaration, 85 Fed. Reg. at 15,202.  This definition, however, has been expanded several times since March 2020.  *See* First Amended Declaration, 85 Fed. Reg. at 21,013–14 (amending the definition of covered countermeasure, in accordance with the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, to include "any respiratory protective device" approved by NIOSH); Second Amended Declaration, 85 Fed. Reg. at 35,102 (amending the definition of covered countermeasure to explicitly include products that "limit the harm that COVID-19 . . . might otherwise cause").   Recently, in December 2020, the definition of covered countermeasure was amended "to make explicit that [it] covers all qualified pandemic and epidemic products under the PREP Act."  Fourth Amended Declaration, 85 Fed. Reg. at 79,193.  Under the December 2020 amended Declaration, a covered countermeasure is

> (a) Any antiviral, any drug, any biologic, any diagnostic, any other device, any respiratory protective device, or any vaccine manufactured, used, designed, developed, modified, licensed, or procured: (i) [t]o diagnose, mitigate, prevent, treat, or cure COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom; or (ii) to limit the harm that COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, might otherwise cause;

> (b) a product manufactured, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious or life-threatening disease or condition caused by a product described in paragraph (a) above;

> (c) a product or technology intended to enhance the use or effect of a product described in paragraph (a) or (b) above; or

> (d) any device used in the administration of any such product, and all components and constituent materials of any such product.

*Id.* at 79,196.   Yet, the Secretary has consistently made clear that "[t]o be a Covered Countermeasure under the Declaration, a product must also meet [the] definition of 'Covered Countermeasure'" as set forth in 42 U.S.C. § 247d-6d(i)(1), discussed above.  *Id.*; *see also* Declaration, 85 Fed. Reg. at 15,202; First Amended Declaration, 85 Fed. Reg. at 21,014; Second Amended Declaration, 85 Fed. Reg. at 35,102.

6

Given that liability immunity under the PREP Act applies only to claims for loss "caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a covered countermeasure," 42 U.S.C. § 247d-6d(a)(1), the meaning of the term "administration" is also important.  "The PREP Act does not explicitly define the term 'administration' but does assign the Secretary the responsibility to provide relevant conditions in the Declaration."  Declaration, 85 Fed. Reg. at 15,200; *see also* 42 U.S.C. § 247d-6d(b)(1).  The Secretary's March 2020 Declaration accordingly provides that "administration" of covered countermeasures "means physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for purpose of distributing and dispensing countermeasures."  Declaration, 85 Fed. Reg. at 15,202.  The Declaration further explains in the preamble:

> The definition of "administration" extends only to physical provision of a countermeasure to a recipient, such as vaccination or handing drugs to patients, and to activities related to management and operation of programs and locations for providing countermeasures to recipients, such as decisions and actions involving security and queuing, but only insofar as those activities directly relate to the countermeasure activities.  Claims for which Covered Persons are provided immunity under the Act are losses caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a Covered Countermeasure consistent with the terms of a Declaration issued under the Act.  Under the definition, these liability claims are precluded if they allege an injury caused by a countermeasure, or if the claims are due to manufacture, delivery, distribution, dispensing, or management and operation of countermeasure programs at distribution and dispensing sites.

> Thus, it is the Secretary's interpretation that, when a Declaration is in effect, the Act precludes, for example, liability claims alleging negligence by a manufacturer in creating a vaccine, or negligence by a health care provider in prescribing the wrong dose, absent willful misconduct.  Likewise, the Act precludes a liability claim relating to the management and operation of a countermeasure distribution program or site, such as a slip-and-fall injury or vehicle collision by a recipient

receiving a countermeasure at a retail store serving as an administration or dispensing location that alleges, for example, lax security or chaotic crowd control. However, a liability claim alleging an injury occurring at the site that was not directly related to the countermeasure activities is not covered, such as a slip and fall with no direct connection to the countermeasure's administration or use. In each case, whether immunity is applicable will depend on the particular facts and circumstances.

*Id.* at 15,200.

In December 2020, the Secretary amended the Declaration "to make explicit that there can be situations where not administering a covered countermeasure to a particular individual can fall within the PREP Act" and the liability protections it affords. Fourth Amended Declaration, 85 Fed. Reg. at 79,194. Accordingly, "[w]here there are limited Covered Countermeasures, not administering a Covered Countermeasure to one individual in order to administer it to another individual can constitute 'relating to . . . the administration to . . . an individual' under [the PREP Act]." *Id.* at 79,197. In other words, "[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act" and its liability protections. *Id.* The Fourth Amended Declaration specifically contemplates a situation where there is a limited number of COVID-19 vaccines and a covered person under the Act chooses not to administer vaccines to those in less vulnerable populations so that those in more vulnerable populations may be vaccinated. *See id.*

A "covered person" under the Act includes:

(A) the United States; or (B) a person or entity that is (i) a manufacturer of [a covered] countermeasure; (ii) a distributor of such countermeasure; (iii) a program planner of such countermeasure; (iv) a qualified person who prescribed, administered, or dispensed such countermeasure; or (v) an official, agent, or employee of a person or entity described in clauses (i), (ii), (iii), or (iv).

42 U.S.C. § 247d-6d(i)(2). The term "person" is defined broadly and "includes an individual, partnership, corporation, association, entity, or public or private corporation, including a Federal,

8

State, or local government agency or department." *Id.* § 247d-6d(i)(5).  Additionally, the term

"program planner" means

> a State or local government, including an Indian tribe, a person employed by the
> State or local government, or other person who supervised or administered a
> program with respect to the administration, dispensing, distribution, provision, or
> use of a security countermeasure or a qualified pandemic or epidemic product,
> including a person who has established requirements, provided policy guidance, or
> supplied technical or scientific advice or assistance or provides a facility to
> administer or use a covered countermeasure in accordance with a declaration
> [issued by the Secretary].

*Id.* § 247d-6d(i)(6).  Neither the text of the statute nor the Secretary's Declaration expressly

includes nursing homes within the definition of "covered person."  However, the Fourth Amended

Declaration makes clear that it "must be construed in accordance with the Advisory Opinions of

the Office of the General Counsel [of Health and Human Services ("HHS")] (Advisory Opinions),"

and the Declaration expressly incorporates such Advisory Opinions.   Fourth Amended

Declaration, 85 Fed. Reg. at 79,194–95.  One of these Advisory Opinions provides that

> any individual or organization can potentially be a program planner and receive
> PREP Act coverage.  So for example, private businesses, public and private
> transportation providers, public and private schools, and religious organizations are
> all eligible for PREP Act coverage when they act in accordance with the PREP Act
> and the Declaration.

(Advisory Opinion 20-04, Dkt. 16, at 3.)  Moreover, HHS's Office of the General Counsel has

issued at least one opinion letter in response to a specific inquiry that concludes that "senior living

communities are 'covered persons' under the PREP Act when they provide a facility to administer

or use a covered countermeasure in accordance with the Secretary's March 10, 2020 Declaration

under the PREP Act."  (Letter from Robert P. Charrow, General Counsel, HHS, to Thomas Baker,

Foley Hoag LLP (Aug. 14, 2020), Dkt. 13-9, at 1.)  Yet, this opinion letter plainly states: "[This

letter] is not a final agency action or a final order.  Nor does it bind HHS or the federal courts.  It does not have the force or effect of law." (*Id.* at 2.)

When the PREP Act applies, it provides broad immunity "from suit and liability under Federal and State law," 42 U.S.C. § 247d-6d(a)(1), and the remedy available to an injured plaintiff is an administrative "Covered Countermeasure Process Fund" ("Process Fund"), administered by the Secretary, that provides "timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure," *see id.* §§ 247d-6e(a), 247d-6e(b)(1).  "No court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary" in administering the Process Fund, *id.* § 247d-6e(b)(5)(C), and compensation through the Process Fund "shall be exclusive of any other civil action or proceeding for any claim or suit this section encompasses," *id.* § 247d-6e(d)(4).  The only exception is if there is "death or serious physical injury proximately caused by willful misconduct," *id.* § 247d-6d(d)(1), in which case an action may "be filed and maintained only in the United States District Court for the District of Columbia," *id.* § 247d-6d(e)(1).  Even so, there is an administrative exhaustion requirement before a plaintiff may bring a suit for injury proximately caused by willful misconduct, *id.* § 247d-6e(d)(1), and the plaintiff may instead elect to accept compensation from the Process Fund, if the Secretary determines that the plaintiff qualifies, *id.* § 247d-6e(d)(5).

The PREP Act also includes a provision expressly preempting state laws that conflict with the terms of the Act:

> During the effective period of a declaration [by the Secretary], or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—

10

(A) is different from, or is in conflict with, any requirement applicable under this section; and

(B) relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the [FDCA].

*Id.* § 247d-6d(b)(8).  Furthermore, the Secretary's Fourth Amended Declaration states that "there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mf'g*, 545 U.S. 308 (2005), in having a uniform interpretation of the PREP Act."  Fourth Amended Declaration, 85 Fed. Reg. at 79,197.  Even more recently, HHS's Office of the General Counsel issued another Advisory Opinion opining that the PREP Act "is a 'complete preemption' statute" and that the Secretary's determination that the Act implicates a "substantial" federal question "provides the underlying basis for invoking the *Grable* doctrine."  (*See* Advisory Opinion 21-01, Dkt. 17-1.)

In sum, the PREP Act—with one limited exception for "willful misconduct"—provides covered persons with immunity from suit for all claims of loss caused by, arising out of, relating to, or resulting from the administration to or use by an individual of covered countermeasures, which include certain drugs, biological products, and devices.  Covered persons broadly include individuals as well as private and public entities, and the administration of a covered countermeasure can include "purposeful allocation" of the countermeasure, including decisions not to provide a countermeasure to an individual.  The Act expressly preempts conflicting state laws and, in the view of the Secretary, implicates "substantial" federal legal and policy interests.

11

## DISCUSSION

### I.    Removal under 28 U.S.C. § 1441(a)

Under 28 U.S.C. § 1441(a), a defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  28 U.S.C. § 1441(a).  It is, however, well-established that "federal courts are courts of limited jurisdiction." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (quoting *Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009)).  "[I]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability."  *Id.* (quoting *Lupo v. Human Affs. Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)); *accord Teamsters Local 404 Health Servs. & Ins. Plan v. King Pharms., Inc.*, 906 F.3d 260, 267 (2d Cir. 2018).  "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper."  *Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 100 (2d Cir. 2004) (quoting *United Food & Com. Workers Union, Local 919 v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994)).

Defendants assert that federal question jurisdiction exists in this case under 28 U.S.C. § 1331, which grants district courts original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States."[1]  (*See* Notice of Removal, Dkt. 1, ¶¶ 9, 14.) Yet, it is settled law that "[a] cause of action arises under federal law only when the plaintiff's 'well-pleaded complaint' raises an issue of federal law."  *New York v. Shinnecock Indian Nation*,

---

[1]  Defendants do not assert diversity jurisdiction under 28 U.S.C. § 1332.  (*See* Notice of Removal, Dkt. 1, ¶¶ 9–24.)

686 F.3d 133, 138 (2d Cir. 2012) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987));

*see also Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) ("[A] suit arises

under the Constitution and laws of the United States only when the plaintiff's statement of his own

cause of action shows that it is based upon those laws or that Constitution."). Indeed, "since 1887

it has been settled law that a case may not be removed to federal court on the basis of a federal

defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's

complaint[.]" *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 14

(1983); *see also Gully v. First Nat'l Bank*, 299 U.S. 109, 116 (1936) ("By unimpeachable authority,

a suit brought upon a state statute does not arise under an act of Congress or the Constitution of

the United States because prohibited thereby.").

      Here, Plaintiff's Complaint pleads no federal claim on its face. Rather, the Complaint

alleges claims of common-law negligence, gross negligence, wrongful death, and medical and

nursing malpractice, as well as violation of New York Public Health Law. (*See* Complaint, Dkt.

1-1, ¶¶ 57–197.) Even if some of these claims implicate or are preempted by federal law by way

of an affirmative defense, such defenses do not appear on the face of the well-pleaded complaint,

and accordingly do not authorize removal to federal court. *See Metro. Life*, 481 U.S. at 63;

*Franchise Tax Bd.*, 463 U.S. at 14; *Gully*, 299 U.S. at 116; *see also Marcus v. AT&T Corp.*, 138

F.3d 46, 52 (2d Cir. 1998) ("Generally, a complaint that pleads only state law causes of action may

not be removed to federal court even where Congress has chosen to regulate the entire field of law

in the area in question.").

      There are, however, two exceptions to the well-pleaded complaint rule: (1) when a claim,

though pleaded as a state-law claim, "is 'really' one of federal law"; and (2) when "some

substantial, disputed question of federal law is a necessary element" of a well-pleaded state-law

claim. *Franchise Tax Bd.*, 463 U.S. at 13. Defendants argue that one or both exceptions apply here. (*See* Defendants' Opposition to Motion to Remand ("Defs.' Opp."), Dkt. 13, at 8–21.) The Court disagrees.

### A. None of Plaintiff's Claims Are "Really" One of Federal Law

#### 1. The PREP Act Does Not Establish Complete Preemption

As already explained, the well-pleaded complaint rule prohibits parties from manufacturing federal jurisdiction by way of a federal affirmative defense. The "corollary" to this rule is that "a plaintiff may not defeat federal subject-matter jurisdiction by 'artfully pleading' his complaint as if it arises under state law where the plaintiff's suit is, in essence, based on federal law." *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 271 (2d Cir. 2005) (citing, *inter alia*, *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475–76 (1998)). "The artful pleading rule applies when Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that plaintiff cannot avoid removal by declining to plead necessary federal questions, or (2) expressly provided for the removal of particular actions asserting state law claims in state court." *Romano v. Kazacos*, 609 F.3d 512, 519 (2d Cir. 2010) (internal citations and quotations omitted). The second situation is plainly inapplicable here; no one argues that the PREP Act, or other act of Congress, expressly provides for removal of any of Plaintiff's claims. *Cf. Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003) (observing that the Price-Anderson Act "not only gives federal courts jurisdiction over tort actions arising out of nuclear accidents but also expressly provides for removal of such actions brought in state court even when they assert only state-law claims" (citing *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484–85 (1999))). The question, then, is whether, as Defendants argue (*see* Defs.' Opp., Dkt. 13, at 10–16), the PREP Act "completely" preempts Plaintiff's claims.

The doctrine of complete preemption "must be distinguished from ordinary preemption, also known as defensive preemption." *Sullivan*, 424 F.3d at 272 (citation omitted). "Ordinary defensive preemption comes in three familiar forms: express preemption, conflict preemption, and field preemption," *id.* at 273 (citations omitted), and these forms of preemption plainly are subject to well-pleaded complaint rule, *see Franchise Tax Bd.*, 463 U.S. at 14. Complete preemption, on the other hand, occurs where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metro. Life*, 481 U.S. at 65). The Supreme Court has recognized only three statutory provisions as having such extraordinary preemptive force: (1) Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185; (2) Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a); and (3) Sections 85 and 86 of the National Bank Act, 12 U.S.C. §§ 85–86. *Sullivan*, 424 F.3d at 272 (citations omitted); *accord Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 (2d Cir. 2019) (per curiam). Additionally, the Second Circuit has extended the doctrine of complete preemption to claims under the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA"). *In re WTC Disaster Site*, 414 F.3d 352, 375–80 (2d Cir. 2003). The commonality among all of these statutes is that they "provide[] the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action." *Anderson*, 539 U.S. at 8; *see also In re WTC Disaster Site*, 414 F.3d at 380 ("[I]n making the ATSSSA-created federal cause of action the exclusive remedy for damages arising out of the September 11 plane crashes, Congress clearly expressed its intent to preempt state-law remedies for damages claims arising out of those crashes."). Accordingly, "to determine whether a federal statute completely preempts a state-law

claim within its ambit, we must ask whether the federal statute provides 'the exclusive cause of action' for the asserted state-law claim." *Sullivan*, 424 F.3d at 275–76 (quoting *Anderson*, 539 U.S. at 9).

Here, the PREP Act does not provide the exclusive cause of action for claims that fall within its scope; in fact, for the most part, the Act provides no causes of action at all. As the Second Circuit explained in *Sullivan*, a federal statute that provides an exclusive cause of action for an asserted state-law claim "gives rise to original federal jurisdiction, and as a consequence allows removal under 28 U.S.C. § 1441," with respect to the asserted state-law claim. *Id.* at 276. In other words, as with complete preemption under the LMRA, ERISA, and National Bank Act, "the district court may then adjudicate the claim on the merits under the relevant preemptive statute." *Id.* (citations omitted). The relevant statute in *Sullivan*, the Railway Labor Act ("RLA"), did not satisfy this criterion because it gave primary jurisdiction over the claims at issue to "board[s] of adjustment," or arbitral panels, established under the RLA. *See id.* at 270, 276 (citing 45 U.S.C. § 184). Recognizing that the plaintiffs' state-law claims, even if they fell within the scope of the RLA, could not have been filed in the first instance in federal court, the Second Circuit accordingly concluded that it was "clear that the RLA does not completely preempt state-law claims that come within its scope." *Id.* at 276.

The same is true of the PREP Act. As an initial matter, it is important to note that the PREP Act is, at its core, an immunity statute; it does not create rights, duties, or obligations. *See* 42 U.S.C. § 247d-6d(a)(1). Accordingly, in providing immunity from suit to certain covered persons for certain types of claims, the PREP Act confers primary jurisdiction over most claims within its scope not to the federal courts but to the Secretary, who has the sole authority to administer and provide compensation from a "Covered Countermeasure Process Fund." *See* 42 U.S.C. §§ 247d-

6e(a), 247d-6e(b).  Even with PREP Act claims involving "willful misconduct," which may be brought exclusively in the United States District Court for the District of Columbia, the plaintiff must first exhaust administrative remedies, and may elect to accept compensation from the Process Fund instead of filing suit in federal court.  42 U.S.C. §§ 247d-6e(d)(1), 247d-6e(d)(5); *see also* 42 U.S.C. §§ 247d-6d(d)(1), 247d-6d(e)(1).  Thus, except for one narrow exception, PREP Act claims cannot be brought in federal court.  Defendants admit as much, making plain their purpose in removing: "[T]his Court must retain jurisdiction, and thereafter, it should conclude that the PREP Act applies for dismissal of this case."  (Defs.' Opp., Dkt. 13, at 5.)  The defendant in *Sullivan* had precisely the same motive for removal.  *See Sullivan*, 424 F.3d at 276 ("Indeed, [defendant] removed [plaintiffs' state-law] claim to federal district court for the sole purpose of asking that court to dismiss [plaintiffs'] claim on the basis that the federal court could not hear it.").  Accordingly, just as the Second Circuit in *Sullivan* concluded that the RLA does not completely preempt state-law claims that come within its scope, so too does this Court conclude that the PREP Act does not completely preempt state-law claims within its scope.  *See id.* at 276–77.

Defendants' arguments do not compel a different conclusion.  These arguments are all in the same vein: Congress intended to "provide only federally directed remedies" for claims under the PREP Act.  (Defs.' Opp., Dkt. 13, at 12–13.)  Such arguments, however, confuse complete preemption with field preemption, which are distinct concepts.  *See Sullivan*, 424 F.3d at 273 n.7 (noting that although "[s]ome commentators seem to equate the defense of field preemption . . . with the doctrine of complete preemption," the two are "better considered distinct").  Under field preemption, "state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."  *English v. Gen. Elec. Co.*,

496 U.S. 72, 79 (1990).  Complete preemption, on the other hand, "operates to create federal subject-matter jurisdiction." *Sullivan*, 424 F.3d at 272 n.5.  Importantly, only complete preemption provides a basis for removal; returning to the well-pleaded complaint rule, an action may not be removed simply because the defendant can raise the *defense* of field preemption.  *See Sullivan*, 424 F.3d at 273 (citing *Caterpillar*, 482 U.S. at 393; *Franchise Tax Bd.*, 463 U.S. at 14); *Marcus*, 138 F.3d at 52 ("Generally, a complaint that pleads only state law causes of action may not be removed to federal court even where Congress has chosen to regulate the entire field of law in the area in question."); *see also Visina v. Wedge Cmty. Co-op, Inc.*, No. 07-CV-122 (DSD) (SRN), 2007 WL 2908043, at *7 (D. Minn. Oct. 1, 2007) ("[R]emoval based on 'complete preemption' involves something different than just a broad preemptive scheme.  In fact, it is a difference in kind, not a difference in degree." (citing *Sullivan*, 424 F.3d at 275)).

Defendants also point to a recent January 8, 2021 Advisory Opinion by HHS's Office of the General Counsel, which opines that the PREP Act "is a 'complete preemption' statute" because it establishes "a federal cause of action, *administrative or judicial*, as the only viable claim." (Advisory Opinion 21-01, Dkt. 17-1, at 2 (emphasis added).)  In other words, according to the Advisory Opinion, a statute provides an exclusive federal cause of action for purposes of complete preemption even if "the exclusive initial venue is a federal administrative agency."  (*See id.*) Although the Secretary's Declaration under the PREP Act "must be construed in accordance with the Advisory Opinions of the Office of the General Counsel," Fourth Amended Declaration, 85 Fed. Reg. 79,194–95, the Advisory Opinion here expressly states that it "does not have the force or effect of law" (Advisory Opinion 21-01, Dkt. 17-1, at 5).  Thus, even assuming that Congress intended to delegate authority to the Secretary and HHS's Office of the General Counsel "generally to make rules carrying the force of law," the Office of the General Counsel interpretation relied

upon by Defendants here explicitly was not "promulgated in the exercise of that authority" and is not entitled to *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (deciding that no *Chevron* deference is due where an agency's rule or opinion was not "promulgated in the exercise of" any delegated congressional authority).

Moreover, the Court finds that the interpretation lacks the "power to persuade." *Cf. id.* at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105–06 (2d Cir. 2011) ("Agency interpretations in opinion letters are 'entitled to respect' to the extent they have the 'power to persuade.'" (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000))). The Advisory Opinion cites no cases for its proposition that an exclusive federal administrative remedy is sufficient for complete preemption. (*See* Advisory Opinion 21-01, Dkt. 17-1, at 2.) And in fact, the Second Circuit has indicated just the opposite. In arriving at its holding in *Sullivan*, the Second Circuit analyzed so-called "*Garmon* preemption," which commits claims arising under Sections 7 and 8 of the National Labor Relations Act ("NLRA") exclusively to the National Labor Relations Board ("NLRB") in the first instance. *Sullivan*, 424 F.3d at 277 (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244–47 (1959)). Thus, under *Garmon* preemption, the exclusive initial venue for claims under Sections 7 and 8 of the NLRA is a federal administrative agency. *Garmon*, 359 U.S. at 244–45. Yet, the Second Circuit observed in *Sullivan* that "lower courts have uniformly held that defendants may not remove state claims to federal court by alleging *Garmon* preemption." *Sullivan*, 424 F.3d at 277 (quoting *TKO Fleet Enters., Inc. v. Dist. 15, Int'l Ass'n of Machinists & Aerospace Workers*, 72 F. Supp. 2d 83, 87 (E.D.N.Y. 1999) (collecting cases)); *see also Isufi v. Prometal Constr., Inc.*, 927 F. Supp. 2d 50, 58 (E.D.N.Y. 2013) ("It would be 'internally inconsistent' to assert that a district court has jurisdiction for the purpose of removal but that the court must then dismiss the

action because the statute confers primary jurisdiction on another adjudicative body." (citing *Sullivan*, 424 F.3d at 276–77)).[2]

Finally, Defendants point to a recent filing by the United States Attorney's Office for the Middle District of Tennessee in a similar case to this one, also involving a nursing home.  (Dkt. 18 (attaching Statement of Interest of the United States, *Bolton v. Gallatin Ctr. for Rehab. & Healing, LLC*, No. 20-CV-683 (M.D. Tenn. Jan. 19, 2021), ECF No. 35-1.)  That filing highlights the Second Circuit's decision in *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2003), and argues that the ATSSSA, which the Second Circuit determined was a complete preemption statute, "is structurally similar to the PREP Act."  (Dkt. 18-1, at 5; *see also id.* at 9–10.)  The Court, however, disagrees with the government's position in *Bolton* and its comparison of the PREP Act to the ATSSSA.   True, similar to the PREP Act, the ATSSSA created an administrative "Victim Compensation Fund" to provide relief for injuries resulting from the September 11, 2001 aircraft hijackings and crashes.  *In re WTC Disaster Site*, 414 F.3d at 373–74 (quoting ATSSSA, § 405(c)).  But, crucially, the ATSSSA *also created* an alternative, *exclusive* federal cause of action for claims "arising out" of the plane hijackings and crashes:

> There shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001. . . . [T]his cause of action shall be the *exclusive* remedy for damages arising out of the hijacking and subsequent crashes of such flights.

---

[2]  Defendants highlight a recent "tentative" decision by a court in the District Court for the Central District of California, which found the Advisory Opinion persuasive and, relying on the Advisory Opinion, concluded that the PREP Act is a complete preemption statute.  (*See* Dkt. 19 (attaching "tentative order" in *Garcia v. Welltower OpCo Grp.*, No. 20-CV-2250 (JVS) (KES)); *see also* Dkt. 19-1, at 10–11 (relying on Advisory Opinion to conclude that the PREP Act provides for complete preemption.)  For the reasons discussed herein, this Court respectfully disagrees and concludes that the Advisory Opinion is unpersuasive and not entitled to any deference.

*Id.* at 374 (emphasis added) (quoting ATSSSA § 408(b)(1)).  Using the term "ATSSSA-created cause of action" or "ATSSSA-created federal cause of action" no fewer than five times in its discussion of complete preemption, the Second Circuit concluded that it was this exclusive federal remedy, which could be brought only in the United States District Court for the Southern District of New York, that gave the statute its extraordinary preemptive force, such that any claim within its scope was really a federal-law claim.  *See id.* at 375–80; *see also Franchise Tax Bd.*, 463 U.S. at 13 (exception to the well-pleaded complaint rule requires that state-law claim "really" be "one of federal law").  The PREP Act creates no similar exclusive federal cause or right of action.  As already discussed, the PREP Act is an immunity statute that simply limits the causes of actions for claims falling within its ambit, leaving only claims involving "willful misconduct" as able to be adjudicated in federal court, after administrative remedies have been exhausted.  *See* 42 U.S.C. §§ 247d-6d(a)(1), 247d-6d(d)(1), 247d-6d(e)(1); *see also* 42 U.S.C. § 247d-6e(d)(1).  Thus, whereas the ATSSSA permits a (specific) federal court to adjudicate ATSSSA claims fully on the merits under section 408 of that statute, the PREP Act permits no such thing.  *Compare In re WTC Disaster Site*, 414 F.3d at 374 ("There shall exist a Federal cause of action for damages arising out of the hijacking and subsequent crashes . . . on September 11, 2001." (emphasis omitted) (quoting ATSSSA, § 408(b)(1))), *with* 42 U.S.C. § 247d-6d(a)(1) ("[A] covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure . . . ."); *id.* § 247d-6d(d)(1) ("[T]he sole exception to the immunity from suit and liability of covered persons set forth in subsection (a) shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct . . . by such covered person.").  *Cf. Sullivan*, 424 F.3d at 276 ("When a state-

law claim is removed to federal court [on the basis of complete preemption], the district court may then adjudicate the claim on the merits under the relevant preemptive statute." (citations omitted)).

In sum, Defendants cite no authority that compels the conclusion that the PREP Act completely preempts state-law claims within its scope such that those claims are really federal-law claims that are removable to federal court.[3]

---

[3] The Secretary's Fifth Amended Declaration also does not compel the conclusion that the PREP Act completely preempts state-law claims within its scope such that those claims would be removable to federal court. The Fifth Amended Declaration extends the scope of "qualified persons" under the Act to include additional healthcare providers who may administer COVID-19 vaccines. *See* 86 Fed. Reg. at 7,874–76. As the preamble to the Fifth Amended Declaration makes clear, "there is an urgent need to expand the pool of available COVID-19 vaccinators in order to respond effectively to the pandemic," and thus, extending the scope of "qualified persons" to include additional healthcare providers who may administer COVID-19 vaccines "achieves two purposes": (1) "the healthcare professionals will be afforded liability protections in accordance with the PREP Act and the terms of this amended Declaration"; and (2) "any State law that would otherwise prohibit the healthcare professionals who are a 'qualified person' from prescribing, dispensing, or administering COVID-19 vaccines is preempted." *Id.* at 7,873. The preamble to the Fifth Amended Declaration goes on to state: "The plain language of the PREP Act makes clear that there is complete preemption of state law as described above." *Id.* at 7,874. The context of this statement, though, makes clear that the term "complete preemption" is being used in the sense that any conflicting state law that would otherwise prohibit a "qualified person" from administering covered countermeasures such as COVID-19 vaccines is, by the express language of the PREP Act, preempted. *See id.* at 7,873–74. Therefore, the term "complete preemption" refers not to the doctrine of complete preemption for purposes of federal-question jurisdiction, but rather to ordinary, defensive preemption. *Cf. Sullivan*, 424 F.3d at 272–73 ("Many federal statutes—far more than support complete preemption—will support a defendant's argument that because federal law preempts state law, the defendant cannot be held liable under state law. . . . The Supreme Court has left no doubt, however, that a plaintiff's suit does not arise under federal law simply because the defendant may raise the defense of ordinary preemption." (citing, *inter alia*, *Franchise Tax Bd.*, 463 U.S. at 14)). In any event, as explained above, the plain language of the PREP Act does not provide the exclusive federal cause of action for claims within its scope, and therefore, it unambiguously does not completely preempt state-law claims such that those claims really arise under federal law. *See Anderson*, 539 U.S. at 9; *Sullivan*, 424 F.3d at 275–76; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) ("[D]eference is not due unless a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity." (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984))).

2.      Plaintiff's Claims Are Not Within the PREP Act's Scope

Even if, however, the PREP Act does completely preempt state-law claims within its scope, Plaintiff's claims are not such claims.  By its plain terms, the PREP Act applies to "all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure."  42 U.S.C. § 247d-6d(a)(1).  The statute in turn, along with the Secretary's Declaration, provides that a "covered countermeasure" encompasses any "qualified pandemic or epidemic product," which is a "drug," "biological product," or "device" that meets specified criteria and regulatory standards.  *See id.* §§ 247d-6d(i)(1), 247d-6d(i)(7); Fourth Amended Declaration, 85 Fed. Reg. at 79,193.  Covered countermeasures also include "respiratory protective device[s]" approved by NIOSH, as well as drugs, biological products, or devices authorized for emergency use under the FDCA.  *See* 42 U.S.C. §§ 247d-6d(i)(1)(C)–(D); First Amended Declaration, 85 Fed. Reg. at 21,013–14.  None of Plaintiff's claims, however, alleges loss "caused by, arising out of, relating to, or resulting from the administration to . . . an individual" of such covered countermeasures, *see id.* § 247d-6d(a)(1), even accepting the Secretary's recent interpretation that "administration to" an individual can include "[p]rioritization or purposeful allocation" of a covered countermeasure, *see* Fourth Amended Declaration, 85 Fed. Reg. at 79,197.  Rather, the crux of Plaintiff's claims is that his father died because Defendants failed to take certain steps such as separating residents, enforcing social distancing among residents and staff, timely restricting visitors, cancelling group and communal activities, ensuring adequate staffing levels, enforcing mask-wearing, and screening people entering the facility for symptoms of COVID-19.  (*See* Complaint, Dkt. 1-1, ¶¶ 110–21; *see also id.* ¶¶ 134–45, 158–69.)  These alleged failures cannot be said to be administering—or even prioritizing or purposefully allocating—a drug, biological product, or device to an individual within the meaning of the PREP Act such that Plaintiffs' claims are completely preempted.

23

The Court is far from alone in reaching this conclusion.  In fact, there is a growing consensus among courts across the country that state-law claims of negligence and wrongful death brought against a nursing home for failure to protect against the spread of COVID-19, like those that Plaintiff alleges, are not properly characterized as federal-law claims under the PREP Act. *See Anson v. HCP Prairie Vill. KS OpCo LLC*, No. 20-CV-2346 (DDC) (JPO), 2021 WL 308156, at *9–11 (D. Kan. Jan. 29, 2021); *Estate of Smith ex rel. Smith v. The Bristol at Tampa Bay Rehab. & Nursing Ctr.*, No. 20-CV-2798 (T) (60SPF), 2021 WL 100376, at *1–2 (M.D. Fla. Jan. 12, 2021); *Gunter v. CCRC OPCO-Freedom Square, LLC*, No. 20-CV-1546, 2020 U.S. Dist. LEXIS 201622, at *9–15 (M.D. Fla. Oct. 29, 2020); *Sherod v. Comprehensive Healthcare Mgmt. Servs., LLC*, No. 20-CV-1198, 2020 WL 6140474, at *7–8 (W.D. Pa. Oct. 16, 2020); *Saldana v. Glenhaven Healthcare LLC*, No. 20-CV-5631 (FMO) (MAA), 2020 WL 6713995, at *2 (C.D. Cal. Oct. 14, 2020); *Martin v. Serrano Post Acute LLC*, No. 20-CV-5937 (DSF) (SK), 2020 WL 5422949, at *2 (C.D. Cal. Sept. 10, 2020); *Brown v. Big Blue Healthcare, Inc.*, No. 20-CV-2261 (HLT) (JPO), —F. Supp. 3d—, 2020 WL 4815078, at *3–8 (D. Kan. Aug. 19, 2020);[4] *Estate of*

---

[4]  On August 19, 2020, the United States District Court for the District of Kansas decided a series of related cases arising out of COVID-19-related deaths at a long-term care facility, of which *Brown v. Big Blue Healthcare, Inc.*, is one.  *Brown*, 2020 WL 4815078, at *1 n.1.  The *Brown* court similarly concluded in all of these cases that the PREP Act was inapplicable to the plaintiffs' state-law claims and could not be used to confer federal-question jurisdiction under the doctrine of complete preemption.  *See Jackson v. Big Blue Healthcare, Inc.*, No. 20-CV-2259 (HLT) (JPO), 2020 WL 4815099, at *3–8 (D. Kan. Aug. 19, 2020); *Block v. Big Blue Healthcare, Inc.*, No. 20-CV-2262 (HLT) (JPO), 2020 WL 4815076, at *3–8 (D. Kan. Aug. 19, 2020); *Long v. Big Blue Healthcare, Inc.*, No. 20-CV-2263 (HLT) (JPO), 2020 WL 4815079, at *3–8 (D. Kan. Aug. 19, 2020); *Campbell v. Big Blue Healthcare, Inc.*, No. 20-CV-2265 (HLT) (JPO), 2020 WL 4815082, at *3–8 (D. Kan. Aug. 19, 2020); *Harris v. Big Blue Healthcare, Inc.*, No. 20-CV-2266 (HLT) (JPO), 2020 WL 4815098, at *3–8 (D. Kan. Aug. 19, 2020); *Baskin v. Big Blue Healthcare, Inc.*, No. 20-CV-2267 (HLT) (JPO), 2020 WL 4815074, at *3–8 (D. Kan. Aug. 19, 2020); *Eaton v. Big Blue Healthcare, Inc.*, No. 20-CV-2291 (HLT) (JPO), —F. Supp. 3d—, 2020 WL 4815085, at *3–8 (D. Kan. Aug. 19, 2020); *Lutz v. Big Blue Healthcare, Inc.*, No. 20-CV-2316 (HLT) (JPO), —F. Supp. 3d—, 2020 WL  4815100, at *2–8 (D. Kan. Aug. 19, 2020); *Fortune v. Big Blue Healthcare, Inc.*, No. 20-CV-2318 (HLT) (JPO), 2020 WL 4815097, at *2–8 (D. Kan. Aug. 19,

*Maglioli v. Andover Subacute Rehab. Ctr. I*, No. 20-CV-6605/6985 (KM) (ESK), —F. Supp. 3d—, 2020 WL 4671091, at *4–11 (D.N.J. Aug. 12, 2020).  The Court agrees with the consensus among district courts across the country that state-law claims of negligence and wrongful death like those Plaintiff alleges here are not federal-law claims under the PREP Act.

Defendants resist this conclusion by arguing that the "entire premise" of Plaintiff's lawsuit is that "whatever countermeasures that were administered and utilized by [Defendants] were inadequate," and thus, Plaintiff "directly invokes" the administration and use of covered countermeasures under the PREP Act.  (Defs.' Opp., Dkt. 13, at 19.)  Defendants relatedly argue that Plaintiff's alleged injury—his father's death—"is clearly related to the use" of covered countermeasures, because Defendants used personal protective equipment ("PPE") such as rubber gloves and N95 masks to prevent transmission of the virus, screened visitors and staff with FDA-approved thermometers, and treated presumed and established cases of COVID-19 with FDA-approved medications like Tylenol and IV fluids.  (*Id.*)  These arguments are unavailing.

First, the Court disagrees with Defendants that the premise, much less the "entire" premise, of Plaintiff's claims is that Defendants' administration or use of covered countermeasures was inadequate.  As already discussed, the crux of Plaintiff's claims is that failures such as not cancelling group activities, not timely restricting visitors, not enforcing social distancing and mask-wearing, and not ensuring adequate staffing levels caused his father's death.  (*See, e.g.*, Complaint, Dkt. 1-1, ¶¶ 110–21).  These alleged failures do not involve administering, or even purposefully allocating, "covered countermeasures," which the plain terms of the PREP Act define as certain drugs, biological products, and devices.  *See* 42 U.S.C. §§ 247d-6d(i)(1), 247d-6d(i)(7);

―――――――――――――――――

2020); *Rodina v. Big Blue Healthcare, Inc.*, No. 20-CV-2319 (HLT) (JPO), 2020 WL 4815102, at *2–8 (D. Kan. Aug. 19, 2020).

*see also* Fourth Amended Declaration, 85 Fed. Reg. at 79,196 ("To be a Covered Countermeasure

under the Declaration, a product must also meet 42 U.S.C. § 247d-6d(i)(1)'s definition of 'Covered

Countermeasure.'").

      Second, to the extent that Defendants argue that Plaintiff's claims implicate or are

"inextricably intertwined" with Defendant's use of covered countermeasures, the Court agrees

with another district court that rejected the same argument:

> Suffice it to say that the Court is not convinced that a facility using covered
> countermeasures <u>somewhere</u> in the facility is sufficient to invoke the PREP Act as
> to all claims that arise in that facility.  The PREP Act still requires a causal
> connection between the injury and the use or administration of covered
> countermeasures, and that link is not present under Defendants' interpretation.

*Brown*, 2020 WL 4815078, at *7 (internal footnotes omitted).  Indeed, even if Plaintiff could have

brought claims that fall under the PREP Act given the alleged actions or inactions of Defendants,

Plaintiff's actual claims facially rest on an alleged duty arising from or related to proper standards

of general medical and nursing care, not the administration or use of certain drugs, biological

products, or devices, *i.e.*, the countermeasures covered under the PREP Act.  (*See* Complaint, Dkt.

1-1, ¶¶ 57–197.)  Accordingly, even if the PREP Act established complete preemption with respect

to certain claims, Plaintiff's claims do not come within its scope such that his claims would be

completely preempted.  *Cf. Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (holding, in the

separate context of complete preemption under Section 502(a) of ERISA, that a state-law claim

falls "within the scope of" ERISA only if "there is no other independent legal duty that is

implicated by a defendant's actions"); *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321,

328 (2d Cir. 2011) (observing that a claim that "*could* have been brought under ERISA, but *also*

rests on another independent legal duty that is implicated by the defendant's actions" is not

completely preempted (internal quotation and alterations omitted)).

In sum, Plaintiff's claims are not completely preempted by the PREP Act.  The PREP Act does not provide an exclusive federal cause of action for claims that come within its scope—but even if it did, Plaintiff's claims are not such claims.  To be clear, the Court makes no decision as to whether Plaintiff's claims are barred by the PREP Act under principles of ordinary defensive preemption, or otherwise.  That issue is for the state court to decide.  *See Sullivan*, 424 F.3d at 277–78 ("[W]e have no occasion to consider the merits of [defendant's] argument that the plaintiffs' [state-law claims] are subject to ordinary preemption.  [Defendant] is free to make this argument in state court and, ultimately, to seek federal-court review by petitioning the Supreme Court for certiorari if [it] loses in the state courts."); *see also Martin*, 2020 WL 5422949, at *2 ("If Defendants believe that some or all of Plaintiffs' state law claims are barred by the PREP Act, the appropriate response is to file a demurrer in state court.").

**B.     None of Plaintiff's Claims Necessarily Raise a Substantial, Disputed Federal Question**

Even where a plaintiff's case contains only proper, well-pleaded state-law claims, "in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) (citation omitted).  This exception to the well-pleaded complaint rule applies to "a special and small category of cases," where "a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (internal quotation marks and citations omitted); *accord New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016).  If any of the four requirements is not satisfied, the exception does not apply.  *See Gunn*, 568 U.S. at 258; *Jacobson*, 824 F.3d at 315.

Here, none of Plaintiff's claims "necessarily" raise a federal issue. "A state-law claim 'necessarily' raises federal questions when the claim is affirmatively 'premised' on a violation of federal law." *Jacobson*, 824 F.3d at 315 (quoting *Grable*, 545 U.S. at 314); *see also Franchise Tax Bd.*, 463 U.S. at 13 (observing that original federal jurisdiction may lie where "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims"). As the Complaint establishes, none of Plaintiff's various claims of negligence, gross negligence, wrongful death, malpractice, or violation of New York Public Health Law are affirmatively premised on the PREP Act, nor is the PREP Act an essential element of any of Plaintiff's claims. (*See* Complaint, Dkt. 1-1, ¶¶ 57–197.) Defendants argue that "[P]laintiff's causes of action sounding in state tort law 'necessarily' raise[] the issue of whether [Defendants] were acting under and were accordingly afforded immunity under the PREP Act." (Defs.' Opp., Dkt. 13, at 9.) But this only shows that Defendants may have an affirmative defense to Plaintiff's claims, not that Plaintiff's claims are affirmatively premised on, or on their face necessarily require resolution of, the PREP Act. As previously discussed, it is well-settled law that "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Franchise Tax Bd.*, 463 U.S. at 14; *see also Caterpillar*, 482 U.S. at 399 ("[A] *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated. If a defendant could do so, the plaintiff would be master of nothing." (internal citations omitted)).

The recent Advisory Opinion, previously discussed, opining that the Secretary's Fourth Amended Declaration supports the *Grable* doctrine is unpersuasive.[5]  (*See* Advisory Opinion 21-01, Dkt. 17-1, at 4–5 (opining, *inter alia*, that the Secretary's determination that the Act implicates a "substantial" federal question "provides the underlying basis for invoking the *Grable* doctrine").)  The Advisory Opinion's only guidance on the "necessarily raised" factor is a selective (mis)quotation[6] from *Grable*: "Thus, a substantial federal question is implicated, for example, where 'the interpretation of a federal statute [] actually is in dispute in the litigation and is so important that it sensibly belongs in federal court.'"  (*Id.* at 4–5 (alteration in original) (quoting *Grable*, 545 U.S. at 315).)  The plaintiff in *Grable*, however, "premised its superior title claim [*i.e.*, its well-pleaded state-law claim] on a failure by the IRS to give it adequate notice, *as defined by federal law*."  *Grable*, 545 U.S. at 314–15 (emphasis added).  The *Grable* Court therefore concluded: "Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim[.]"  *Id.* at 315.  By contrast, here, the PREP Act, a statute affording immunity, is not an essential element of any of Plaintiff's claims.  The Advisory Opinion

---

[5]  Again, the Advisory Opinion expressly states that it "does not have the force or effect of law."  (Dkt. 17-1, at 5.)  Therefore, as discussed above, the Advisory Opinion is not entitled to *Chevron* deference because it is, at the least, not "promulgated in the exercise of" any delegated congressional authority.  *See Mead*, 533 U.S. at 226–27.

[6]  Whereas the Advisory Opinion states that "a substantial federal question is implicated, for example, where 'the interpretation of a federal statute [] actually is in dispute in the litigation and is so important that it sensibly belongs in federal court,'" (Dkt. 17-1, at 4–5 (alteration in original) (quoting *Grable*, 545 U.S. at 315)), *Grable* actually says the following:

> Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case.  The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court.

*Grable*, 545 U.S. at 315.

is thus unhelpful.  It, moreover, takes the incredible position that once *Grable* is invoked, "the court retains the case to decide whether the immunity and preemption provisions apply; if they do not apply, then the court would try the case as it would a diversity case" (Dkt. 17-1, at 5), presumably even if the parties, as here, are not diverse.  The Court declines to accept this effective rewriting of diversity jurisdiction under 28 U.S.C. § 1332, and principles of subject-matter jurisdiction more generally.  *Cf. Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990) ("Since its enactment, we have interpreted the diversity statute [28 U.S.C. § 1332] to require 'complete diversity' of citizenship." (citing *Strawbridge v. Curtiss*, 3 Cranch 267 (1806))); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 76–77 (1996) ("[I]f, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated." (citing Fed. R. Civ. P. 12(h)(3))).  Rather, the Court follows every district court to have considered the *Grable* exception in this context, and concludes that federal-question jurisdiction does not "lie over" Plaintiff's state-law claims.  *See Anson*, 2021 WL 308156, at *11 n.7; *Smith*, 2021 WL 100376, at *2; *Saldana*, 2020 WL 6713995, at *2 n.3; *Martin*, 2020 WL 5422949, at *2–3.

*     *     *

Accordingly, the Court does not have subject-matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1331, and thus, removal under 28 U.S.C. § 1441(a) was improper.

## II.     Removal under 28 U.S.C. § 1442(a)(1)

Under 28 U.S.C. § 1442(a)(1)—the federal-officer removal statute—a case may be removed if it is against (1) the United States; (2) any agency of the United States; or (3) "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  Defendants invoke the part of the statute that allows for removal of cases against "any person acting under" a federal officer.  (*See* Notice of Removal, Dkt. 1, ¶¶ 12–13.)  Removal

under this provision is proper if Defendants (1) "are persons within the meaning of the statute who acted under a federal officer"; (2) "performed the actions for which they are being sued under color of federal office"; and (3) "raise a colorable federal defense." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008) (internal citations, quotation marks, and alterations omitted).

A "person" within the meaning of the federal-officer removal statute "includes corporate persons." *Id.* at 136. The phrase "acting under," moreover, is "to be interpreted broadly," and unlike the general removal statute, the federal-officer removal statute "must be liberally construed." *See id.* (citations omitted).

Nonetheless, the Supreme Court has made clear that when a private person is "acting under" a federal officer, such action "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007) (citing *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)). "[T]he help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* Indeed, even "a highly regulated" private entity "cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.* at 153. This holds true "even if the regulation is highly detailed and even if the private [entity's] activities are highly supervised and monitored." *Id.* Instead, "there must exist a 'special relationship' between" the federal and private entities. *Isaacson*, 517 F.3d at 137 (quoting *Watson*, 551 U.S. at 157). For example, such a special relationship exists with respect to "a private contractor supplying the Government with a product it needed during war—'a product that, in the absence of Defendants, the Government would have had to produce itself.'" *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 317 (E.D.N.Y. 2014) (quoting *Isaacson*, 517 F.3d at 137); *see also Hicksville Water Dist. v. Jerry Spiegel Assocs., Inc.*, No. 19-CV-6070 (PKC) (SMG), 2020 WL 3129162, at *4 (E.D.N.Y. June 12, 2020) (finding

that a government sub-contractor who was under contract "to research and develop nuclear material," and whose work was "closely controlled and supervised [by the government]," was a person "acting under" a federal officer). On the other hand, a health center that receives federal grants and that "is subject to a host of federal requirements and regulations pertaining to the health services it provides, and the manner in which it expends its funds," is not "acting under" a federal officer within the meaning of the statute. *See Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 607–08 (2d Cir. 2014) (summary order).

Defendants have not demonstrated that they are persons "acting under" a federal officer. Defendants assert that they were "acting under specific federal instructions/regulations since the [CMS] and the [CDC] specifically compelled healthcare providers and nursing homes to respond to the COVID-19 pandemic." (Notice of Removal, Dkt. 1, ¶ 13; *see also* Defs.' Opp., Dkt. 13, at 21–24.) Defendants point out that they "had no independent decision making ability" in terms of following CDC regulations as directed by the New York State Department of Health. (Defs.' Opp., Dkt. 13, at 22.) But these assertions do not evince a "special relationship" with the federal government or otherwise show that Defendants were anything more than "highly regulated" private persons or entities complying with federal laws and regulations. *See Watson*, 551 U.S. at 152–53; *see also Veneruso*, 586 F. App'x at 607–08. Indeed, as the United States District Court for the District of New Jersey recently observed in a case like this one, brought against owners and operators of private nursing facilities:

> Defendants' line of reasoning would have very far-reaching consequences. Consider, for example, that during this pandemic many private persons or entities have received federal funds under the CARES act and its Paycheck Protection Program ("PPP"), and may point to their dutiful compliance with CDC guidelines for limiting occupancy, face coverings, and health and sterilization measures. Small and large entities alike, including nonprofits, restaurants, vineyards, construction companies, and religious organizations, have accepted such funding,

all while attempting to implement measures to curb the spread of COVID-19. Under Defendants' line of reasoning, all of these entities would be acting under a federal officer for purposes of [28 U.S.C.] § 1442(a)(1).

*Estate of Maglioli*, —F. Supp. 3d—, 2020 WL 4671091, at *13 (internal citations omitted).  This Court, like the District of New Jersey and every other federal court to have examined the issue, agrees that the federal-officer statute cannot be read as broadly as Defendants would like it to be. *See id.*; *see also Saldana*, 2020 WL 6713995, at *3; *Martin*, 2020 WL 5422949, at *1.

Accordingly, the Court finds that Defendants are not persons "acting under" a federal officer, and do not otherwise qualify for federal-officer removal.  Removal under 28 U.S.C. § 1442(a)(1) was therefore improper.

## CONCLUSION

Plaintiff's motion to remand is granted.  This case is remanded to the Supreme Court of New York, Kings County, under Index No. 507780/2020, as the Court lacks subject-matter jurisdiction and Defendants do not qualify for federal-officer removal.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 2, 2021
Brooklyn, New York

33